# No. 13-2500

# United States Court of Appeals for the Fourth Circuit

_____

Blue Sky Travel and Tours, LLC and Mahmoud Riad Mahmoud,
*Plaintiffs-Appellees*,

v.

Nasser Aqeel Al-Tayyar and Al Tayyar Group,
*Defendants-Appellants*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDIA

_____

## BRIEF FOR DEFENDANTS-APPELLANTS
## AL TAYYAR GROUP AND NASSER AQEEL AL-TAYYAR

_____

Christopher M. Curran
Nicole Erb
Matthew S. Leddicotte
**WHITE & CASE** LLP
701 Thirteenth Street, N.W.
Washington, D.C.  20005
Telephone:  + 1 202 626 3600

*Attorneys for Defendants-Appellants*
*Al Tayyar Group and*
*Nasser Aqeel Al-Tayyar*

April 21, 2014

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellant Al Tayyar Group states that it has no parent corporation, and that no publicly held corporation owns, directly or indirectly, 10% or more of the Al Tayyar Group's stock.

Defendant-Appellant Nasser Aqeel Al-Tayyar is a natural person.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................ iv

PRELIMINARY STATEMENT ..............................................................1

JURISDICTIONAL STATEMENT ..........................................................2

ISSUES PRESENTED..................................................................2

STATEMENT OF CASE ................................................................3

      A.     Factual Background..............................................................3

      B.     Procedural History.............................................................5

SUMMARY OF ARGUMENT ...........................................................25

ARGUMENT ........................................................................28

I.     VIRGINIA'S STATUTE OF FRAUDS BARS ANY ACTION ON
THE ALLEGED ORAL AGREEMENT .......................................................28

      A.     This Court Reviews *De Novo* A District Court's Denial Of A
Motion For Judgment As A Matter Of Law.........................................28

      B.     Virginia's Statute Of Frauds Bars Any Action On Any Oral
Agreement That Is Not To Be Performed Within A Year .................28

      C.     The Alleged Oral Agreement Here Could Not Be Performed
Within A Year ...................................................................30

      D.     The District Court Erred By Holding That Defendants Bore The
Burden Of Proof To Disprove Contingencies .....................................32

      E.     Plaintiffs Did Not And Cannot Prove That The Oral Agreement
Could Be Performed Within A Year...............................................36

II.    THE DISTRICT COURT ABUSED ITS DISCRETION BY
       IMPOSING EVIDENTIARY SANCTIONS ON ATG FOR
       FAILURE TO "PRESERVE ALL DOCUMENTS BECAUSE YOU
       DON'T KNOW WHAT MAY OR MAY NOT BE RELEVANT"..............40

       A.    This Court Reviews A District Court's Imposition Of Sanctions
             Under An Abuse Of Discretion Standard, And An Error Of Law
             Constitutes An Abuse Of Discretion...................................................40

       B.    The District Court's Spoliation Finding Was Based On An
             Error Of Law ........................................................................................41

       C.    The District Court's Evidentiary Sanction, Based On The
             Erroneous Spoliation Finding, Was An Abuse Of Discretion ...........46

       D.    Defendants Are Entitled To A New Trial On The Basis Of The
             Spoliation Finding And Evidentiary Sanction ...................................53

CONCLUSION ................................................................................................53

REQUEST FOR ORAL ARGUMENT ..................................................................54

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Albanese v. WCI Cmty., Inc.*,
530 F. Supp. 2d 752 (E.D. Va. 2007) ............................................. 39-40

*Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*,
155 F.3d 500 (4th Cir. 1998) .................................................46

*Baker v. Jim Walter Homes, Inc.*,
438 F. Supp. 2d 649 (W.D. Va. 2006).................................................33

*Belk, Inc. v Meyer Corp. U.S.*,
679 F.3d 146 (4th Cir. 2012) .................................................28

*Bull v. United Parcel Serv., Inc.*,
665 F.3d 68 (3d Cir. 2012) .................................................45

*Cooter & Gell v. Hartmax Corp.*,
496 U.S. 384 (1990).................................................41

*E.F. Hutton & Co., Inc. v. Berns*,
682 F.2d 173 (8th Cir. 1982) .................................................34

*E.I. Du Pont De Nemours & Co. v. Kolon Indus., Inc.*,
803 F. Supp. 2d 469 (E.D. Va. 2011) .................................................26, 42

*Gen. Dynamics Corp. v. United States.*,
131 S. Ct. 1900 (2011).................................................29

*Haigh v. Matsushita Elec. Corp. of Am.*,
676 F. Supp. 1332 (E.D. Va. 1987) .................................................37

*Kolon Indus. v. E.I. Du Pont De Nemours & Co.*,
No. 3:11cv622, 2012 WL 664239 (E.D. Va. Feb. 28, 2012) .................................................48

*Law Enforcement Alliance of Am., Inc. v. USA Direct, Inc.*,
61 F. App'x 822 (4th Cir. 2003) (unpublished).................................................47

*Logistics Transp. Co., Inc. v. Timber Trucking Co., Inc.*,
  141 F.3d 1158, 1998 WL 200321 (4th Cir. 1998) (unpublished)......................29

*Micromedia v. Automated Broad. Controls*,
  799 F.2d 230 (5th Cir. 1986) ...........................................................................34

*Murphy v. Magnolia Elec. Power Ass'n*,
  639 F.2d 232 (5th Cir. 1981) ...........................................................................53

*Nettles v. Costco Wholesale Corp., Inc.*,
  No. 1:06-CV-847, 2006 WL 3299990 (E.D. Va. Oct. 20, 2006) ......................48

*Nycal Offshore Dev. Corp. v. U.S.*,
  92 Fed. Cl. 209 (2010) .....................................................................................30

*Procter & Gamble Co. v. Haugen*,
  427 F.3d 727 (10th Cir. 2005) .........................................................................49

*Roberts v. Americable Int'l Inc.*,
  883 F. Supp. 499 (E.D. Cal. 1995) ..................................................................44

*Samsung Elecs. Co. v. Rambus, Inc.*,
  439 F. Supp. 2d 524 (E.D. Va. 2006) ..............................................................42

*Silvestri v. Gen. Motors Corp.*,
  271 F.3d 583 (4th Cir. 2001) ....................................................................41, 46

*Turner v. United States*,
  736 F.3d 274 (4th Cir. 2013) .............................................................26, 42, 45

*Ty v. Softbelly's Inc.*,
  353 F.3d 528 (7th Cir. 2003) ...........................................................................53

*Vodusek v. Bayliner Marine Corp.*,
  71 F.3d 148 (4th Cir. 1995) .............................................................................43

*Wilson v. Volkswagen of Am., Inc.*,
  561 F.2d 494 (4th Cir. 1977) ....................................................46-47, 50-51

*Wu v. Tseng*,
    No. 2:06cv580, 2008 WL 4360990 (E.D. Va. Sept. 22, 2008) .........................50

*Zubulake v. UBS Warburg LLC*,
    220 F.R.D. 212 (S.D.N.Y. 2003) ........................................................................42

## STATE CASES

*Agbey v. Dalloul*,
    41 Va. Cir. 3 (1996) ...........................................................................................33

*Dynegy, Inc. v. Yates*,
    No. 11-0541, 2013 WL 4608711 (Tex. Aug. 30, 2013) .....................................34

*Eaves v. Vial*,
    34 S.E. 978 (Va. 1900) ......................................................................................33

*Engleby v. Harvey*,
    25 S.E. 225 (Va. 1896) ......................................................................................29

*Falls v. Va. State Bar*,
    397 S.E.2d 671 (Va. 1990) ............................................................ 26, 36-37, 39

*Lewis v. Payne*,
    27 Va. Cir. 194 (1992) .......................................................................................33

*Lindsay v. McEnearney Assoc., Inc.*,
    531 S.E.2d 573 (Va. 2000) ...........................................................................29, 32

*Silverman v. Bernot*,
    239 S.E.2d 118 (Va. 1977) ............................................................ 25, 36-37, 39

## STATUTES

28 U.S.C. § 1291 ......................................................................................................2

28 U.S.C. § 1332 ......................................................................................................2

Va. Code § 11-2, Virginia Statute of Frauds ................................... 25, 28-29, 31, 35

**OTHER AUTHORITIES**

Restatement (Second) of Contracts § 130 (1979) ................................. 29-30, 37- 38

9 Richard A. Lord, Williston on Contracts § 21:1 (4th ed. 1990) .......................... 29

4 Caroline N. Brown, Corbin on Contracts § 19.9
    (Joseph M. Perillo ed., rev. ed. 1997) ................................................................ 38

## PRELIMINARY STATEMENT

This appeal arises from a final judgment in a civil action between two travel agencies and their principals.  The District Court allowed Plaintiffs—Blue Sky Travel and Tours, LLC ("Blue Sky LLC") and Mahmoud Riad Mahmoud ("Mr. Riad")—to maintain a claim based entirely on an alleged oral agreement to split millions of dollars in anticipated profits at the end of the next calendar year. By its terms, however, the alleged oral agreement could not be performed within a year and was thus unenforceable under Virginia's Statute of Frauds.  The District Court separately erred in affirming a Magistrate Judge ruling that ATG had a legal duty to preserve "all documents" in its possession "because you don't know what may or may not be relevant."  On this basis, the District Court unjustifiably imposed sanctions upon Defendants—the Al Tayyar Group ("ATG") and Dr. Nasser Aqeel Al-Tayyar ("Dr. Al-Tayyar")—for supposedly spoliating certain invoices.  The invoices in question were not relevant to Plaintiffs' claims and the information from the invoices was, in any event, preserved and produced.  The unwarranted evidentiary sanctions precluded Defendants from presenting a damages defense and allowed Plaintiffs to severely tarnish Defendants' credibility in front of the jury.  The District Court's failure to apply Virginia's Statute of Frauds, together with the District Court's unjustified evidentiary sanctions, resulted in an unfounded $12.561 million judgment and windfall for Plaintiffs.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties. A jury returned a verdict in favor of Plaintiffs on September 25, 2013 (JA1245) and the District Court entered judgment on October 21, 2013 (JA1320; JA1321; JA1397). On October 21, 2013, Defendants filed motions for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure and for a new trial under Rule 59 of the Federal Rules of Civil Procedure. *See* JA21. Those post-trial motions were denied on November 15, 2013. JA1393. Defendants filed a timely Notice of Appeal on December 13, 2013. JA1394. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final decision of the District Court.

## ISSUES PRESENTED

1.      Whether the Virginia Statute of Frauds applies to an oral agreement allegedly made in June 2011 whereby Blue Sky LLC would purchase airline tickets and service them through at least December 2012 and Blue Sky LLC and ATG would split, at year-end 2012, profits earned on the resale of those tickets.

2.      Whether the District Court abused its discretion by imposing severe evidentiary sanctions based on ATG's failure to preserve "all documents because you don't know what may or may not be relevant."

## STATEMENT OF CASE

### A.    Factual Background

Plaintiff Mr. Riad testified that in 2011 he was the proprietor of a travel agency, Blue Sky Travel and Tours, Inc. ("Blue Sky Inc."). JA822.  He testified that he was contacted by a representative of ATG, the largest travel agency in Saudi Arabia (JA822-24), and met with the Vice-Chairman of ATG, Dr. Al-Tayyar, in "June 2011" to discuss purchasing and servicing airline tickets from ATG's business with the Saudi Ministry of Higher Education ("Ministry") in the United States (JA826-27).  The Ministry pays for thousands of Saudi students who are studying abroad, including in the United States, to fly back to Saudi Arabia once a year, and ATG was the travel agency used by the Ministry to purchase these tickets.  JA792.

Mr. Riad testified that during the June 2011 meeting with Dr. Al-Tayyar, the two reached an oral agreement with three main terms:

1.  Mr. Riad would shut down Blue Sky, Inc. for a price of $850,000 to be paid by Dr. Al-Tayyar to Mr. Riad.  JA831.  Mr. Riad testified that he later agreed to lower this price to $661,000.  JA856-57.  Mr. Riad would form Blue Sky LLC with himself as the managing member and a 51% owner and with Dr. Al-Tayyar as a 49% owner.  JA827.

2.   Once Blue Sky Inc. was wound down "toward the end of the year" (JA833), it would transfer its Airlines Reporting Corporation ("ARC") license— used to purchase airline tickets in the United States—to Blue Sky LLC.  JA835-36; JA1012-13.  After Blue Sky LLC was up and running in the Spring of 2012, it would receive, on a non-exclusive basis, Ministry "requests of boarding passes for the students."  JA829.  Blue Sky LLC would then issue and service those tickets (including any necessary changes or cancellations), and would submit invoices to ATG for the ticket price plus a $100 service fee per passenger.  JA829, 841.  ATG then would invoice the Ministry.  JA828.

3.   "At the end of the year" 2012, Mr. Riad testified, ATG and Blue Sky LLC would "split the profits" from ticket sales to the Ministry.  JA828; *see also* JA798 (Riad:  "At the end of the year, [ATG] and Blue Sky [LLC] will split the profits 50/50 . . . ."); JA830 (Riad:  "After they [ATG] collect their money [from the Ministry], they will send us our part, which is a 50 percent at the end of the year."); JA1012 (Plaintiffs' counsel:  "[P]rofits with respect to the business . . . would be split at the end of the calendar year of 2012.").

Mr. Riad testified that ATG handled approximately "$120 million a year" in United States tickets for the Ministry, and that Dr. Al-Tayyar "was planning to give us 50 percent" of this business.  JA828-29.  He also testified that Dr. Al-Tayyar had "told [him] that [his] profit would be between 5 to 6 million."

JA829.  There was no written contract; indeed, there was no writing of any kind memorializing the agreement.  JA869-70, 874-77.  (Dr. Al-Tayyar testified that neither he nor ATG had any profit-splitting agreement with Mr. Riad.  JA1134.)

Mr. Riad testified that he proceeded to close down Blue Sky Inc. at the end of 2011 and to transfer the ARC license to Blue Sky LLC.  JA834-36.  By May 15, 2012, Blue Sky LLC was ready to start issuing tickets.  JA843.  For the next six to eight weeks, Blue Sky LLC handled tickets for over 8,500 passengers (Saudi students and their families), issuing 27,000 tickets.  JA843.  Blue Sky LLC made over $850,000 on the $100 service fee alone in these six to eight weeks.  JA843.  Due to disputes between the parties over the documentation of the ticket purchases, Blue Sky LLC received no more ticket requests from ATG after "late June 2012, beginning of July."  JA853.  Blue Sky LLC continued to service the tickets already purchased (JA971) until January 18, 2013, after the last student ticket had been used (JA841).

## B.    Procedural History

Plaintiffs filed their Complaint on October 12, 2012 (*see* JA4) and their Amended Complaint on June 19, 2013 (JA67).  As described further herein, in a hearing on September 13, 2013, followed by an Order on September 16, 2013, the Magistrate Judge found that ATG had spoliated documents by failing to preserve the original Arabic invoices sent by ATG to the Ministry for vendors *other than*

*Blue Sky LLC*.  JA619-20; JA634.  While ATG indisputably preserved all original invoices sent by ATG to the Ministry for tickets Blue Sky LLC purchased, as well as ordinary-course-of-business spreadsheets showing all invoice information for tickets from other vendors around the world (JA313; JA576), the Magistrate Judge nonetheless found that ATG had spoliated the original invoices for *non-Blue Sky LLC vendors* (JA608-19).  The Magistrate Judge himself had initially concluded that these invoices were irrelevant to Blue Sky LLC's case.  JA354-55.  The Magistrate Judge's spoliation ruling was based upon his legal conclusion that ATG had the duty, once litigation commenced, to preserve "*all documents because you don't know what may or may not be relevant.  That's the law.*"  JA609-10 (emphasis added).  The Magistrate Judge ordered that, as a sanction for spoliation, the jury should be "instructed that it may presume that the profits made on [Blue Sky LLC's] ticket sales to [ATG] and resold to [the Ministry] were 20 million dollars."  JA634.  The Magistrate Judge's Order was challenged by Defendants under Rule 72 of the Federal Rules of Civil Procedure, but was confirmed by the District Court on September 20, 2013.  JA748.

A three-day trial was held on September 23-25, 2013.  *See* JA18-19.  Defendants moved for judgment as a matter of law on the issue of the Statute of Frauds following the close of Plaintiffs' case in chief.  JA996-1025.  The District Court did not grant ATG's motion.  JA1023-25 ("The Court is going to deny the

motion at this time or, more precisely, not grant the motion, which would allow you to renew it at the close of the evidence or following a verdict if the case proceeds that far."). On September 25, 2013, the jury returned its verdict, finding among other things that there was an "oral contract" to split profits on the resale of tickets to the Ministry and that ATG and Dr. Al-Tayyar had breached the terms of such "oral contract." JA1245, Jury Question No. 4.

After trial, Defendants renewed their motion for judgment as a matter of law on the issue of the Statute of Frauds (JA1263-65), and the District Court denied the motion on October 21, 2013 (JA1307). The District Court determined that ATG bore the "burden of proof" to show that the oral agreement was within the Statute of Frauds. JA1309. The District Court found that ATG had not "rule[d] out the possibility that the Ministry . . . could have decided not to order any tickets . . . from ATG . . . thereby eliminating any possible need for any performance by Blue Sky [LLC] or ATG." JA1310. The District Court further found that ATG had not "rule[d] out the possibility that the Ministry contract itself could have been terminated within a year of the parties' June 2011 agreement," leading to no ticket orders or need for performance by the parties. *Id*. The District Court held that ATG had "therefore failed to carry its burden" on the Statute of Frauds. JA1310-11. Defendants filed further motions for a new trial, which were also denied. JA1393.

In light of the Magistrate Judge's orders regarding the spoliation finding and evidentiary presumption, the parties had agreed that the question of damages would be submitted to the Court instead of the jury.  JA768.  In its October 21, 2013 opinion, the District Court held that ATG could not rebut the $20 million presumption of profits, and ordered ATG to pay Blue Sky LLC $10 million in profit-sharing damages.  JA1311-12.

Additional procedural history related to the Magistrate Judge's spoliation finding and evidentiary presumption—unavoidably detailed—is set forth below.

### 1.     Plaintiffs Never Requested Invoices Related To Any Vendors Other Than Blue Sky LLC

Neither of Plaintiffs' complaints contains any allegations relating to billing for any of ATG's vendors other than Blue Sky LLC.  Dkt. 1; JA67.  Each complaint seeks to recover profits solely based on ticket sales by Blue Sky LLC: "fifty percent (50%) of the profit made on the ticket price [ATG] received from [the Ministry]" for tickets purchased by Blue Sky LLC.  JA74.  Plaintiffs' counsel confirmed that Plaintiffs' only claim was with regard to "half the profit made on our [Blue Sky LLC's] tickets.  We're not entitled to half the profits based on anyone else's ticketing activity, and that's never been alleged.  That's simply not a part of the case."  JA701.

Plaintiffs' document requests do not contain any requests relating to billing for any of ATG's vendors other than Blue Sky LLC.  JA93.  Instead, Plaintiffs'

requests are expressly limited to documents relating to "*tickets purchased by Blue Sky* [LLC]." JA117-18 at #12, #13 (emphasis added).

On June 18, 2013, during the deposition of ATG's chief accountant, Hany Ragaie, Plaintiffs' counsel orally stated for the first time that "I'd like the documents that reflect what the Ministry has paid in calendar year 2012 and what the cost of the goods was, the tickets that were delivered to the Ministry." JA326. ATG's counsel responded that ATG had already provided such documents with respect to tickets purchased by Blue Sky LLC. JA326-27. Plaintiffs' counsel replied that he wanted "all the documents that reflect any transfers of money from the Ministry to Al Tayyar Group, period" and that ATG should just "[h]it a button and it prints out a schedule" from their accounting software. JA327. The witness, Mr. Ragaie, testified that this would not be easy, as it would be a huge number of tickets. JA329-31. Defendants did not agree to provide any additional documents to Plaintiffs based on this informal request during a deposition.

Plaintiffs never requested actual invoices related to other vendors. Plaintiffs, moreover, never followed up by seeking any additional documents, schedules, or data pursuant to Rule 34 of the Federal Rules of Civil Procedure. Discovery closed on July 12, 2013. JA28.

### 2. ATG Produced All Invoices To The Ministry Containing Tickets Purchased By Blue Sky LLC

In response to Plaintiffs' written document requests, ATG had produced all invoices that it had submitted to the Ministry for tickets purchased by Blue Sky LLC. JA507; JA290-95 (English Translation). That production consisted of an account statement cover page to the Ministry followed by the invoices reflecting the ticket price information. JA507; JA290-95 (English Translation).

ATG's Chief Financial Officer, Yousif Musa, submitted an affidavit verifying that "the invoices to the [Ministry] produced in discovery are the only invoices submitted that contain tickets purchased by Blue Sky [LLC]." JA313. He similarly explained that no other invoices containing Blue Sky LLC tickets had been submitted due to billing and documentation problems in the invoices received from Blue Sky LLC, which if submitted, might jeopardize ATG's relationship with the Ministry. JA316-17. Mr. Ragaie similarly testified at trial that these were the only invoices submitted to the Ministry, and that ATG had made the decision not to submit additional invoices from Blue Sky LLC to the Ministry for reimbursement due to billing and documentation issues with the invoices that ATG received from Blue Sky LLC. JA1063-65.

### 3. The Magistrate Judge Initially Concluded That Information On Other Vendors Was Not Relevant

On July 3, 2013, Plaintiffs filed a Motion to Compel discovery responses from ATG. JA86. Plaintiffs' Motion to Compel related solely to its discovery requests and did not mention documents relating to vendors other than Blue Sky LLC. JA86. The Magistrate Judge granted Plaintiffs' Motion to Compel on July 12, 2013, and ordered Defendants to complete production by July 26, 2013. JA214.

Plaintiffs, however, mistakenly believed that the Magistrate Judge had ordered the production of documents relating to vendors other than Blue Sky LLC (JA262-63), and filed a Motion for Sanctions on July 26, 2013 arguing that ATG had failed to comply with the Magistrate Judge's order (JA261). Plaintiffs did not point to any written request for documents, and instead relied on the colloquy from Mr. Ragaie's deposition. JA320.

A hearing on Plaintiffs' Motion for Sanctions was held before the Magistrate Judge on August 2, 2013. ATG's counsel confirmed that all invoices containing tickets relating to Blue Sky LLC had been produced. JA343. Plaintiffs' counsel argued that because tickets purchased by various vendors were grouped together in invoices to the Ministry, "we need to have an opportunity to look at all of the invoices from all of the vendors." JA350. But the Magistrate Judge pointed out that, because the invoices contained the Ministry "government request number,"

the only documents that needed to be produced were invoices containing government request numbers handled by Blue Sky LLC. JA352 ("[I]f there are invoices that don't list your government request number, that means that Blue Sky is not related to that ticket sale.").

When Plaintiffs' counsel argued that the Magistrate Judge had already ordered all such documents produced, the Magistrate Judge stated clearly that "No, I specifically recall that [I] said related to Blue Sky. Because *things that aren't related to Blue Sky cannot be reasonably calculated to lead to the discovery of admissible evidence on behalf of Blue Sky's theory*." JA354-55 (emphasis added). As of the hearing on August 2, 2013, therefore, Plaintiffs had never submitted a document request for any documents relating to vendors other than Blue Sky LLC and the Magistrate Judge had not ordered the production of any such documents. Further, the Magistrate Judge had specifically stated that such documents were not relevant to Plaintiffs' case.

### 4.   The Magistrate Judge Nevertheless Subsequently Ordered ATG To "Produce All Invoices" For Non-Blue Sky LLC Vendors

After losing on the initial argument, Plaintiffs' counsel raised a new argument at the same hearing: because certain ATG witnesses testified in depositions that ATG charged the Ministry only a 5% commission across the board, Plaintiffs needed to see every invoice given to the Ministry to determine if

that was true.  JA355.  ATG's markup of 5% to the Ministry concerning Blue Sky LLC tickets was clearly reflected in the produced Blue Sky LLC invoices.  JA295 ("Tax + Ticket Price + 5%").

Despite the fact that Plaintiffs did not have any document request for these invoices, the Magistrate Judge embraced Plaintiffs' new theory:  "[ATG's] representation is that we make a 5 percent commission on all tickets sold to the Ministry.  And [Plaintiffs] have the right to contest that representation. . . . They will get all invoices to the [Ministry]. . . . The Court has ruled."  JA364.

Counsel for ATG raised the fact that no Rule 34 request was made for these documents (JA366), and even offered that ATG was not planning to make this argument or rely on these documents at trial (JA364-65).  The Magistrate Judge rejected these arguments and ordered that ATG produce "the other invoices from the other vendors to the [Ministry] . . . no later than two weeks from today's date." JA366.

The Magistrate Judge explained to ATG's counsel that the only reason these invoices were considered relevant was:  "[Plaintiffs] have the right to disprove that everyone gets 5 percent for purposes of then disproving why you say they get 5 percent. . . . They have the right to place [any] inaccuracy [between the asserted 5% and what the invoices showed] in front of the jury for purposes of determining credibility of your witnesses."  JA 368.  The Magistrate Judge then issued a written

order directing ATG to "produce all invoices by August 16, 2013." JA374. The Magistrate Judge later granted ATG an additional three business days in which to complete production due to the intervening Eid al-Fitr holiday. JA448; JA446.

### 5. ATG Produced The Documents That Plaintiffs Requested At Mr. Ragaie's Deposition

In response to the Magistrate Judge's order compelling discovery, ATG produced 5,266 pages of spreadsheets showing all tickets purchased in 2012 by its numerous vendors worldwide for the Ministry. This data included the government request number, the ticket number, the travel itinerary, the fare, the taxes, fees, and the amounts invoiced to the Ministry. JA460. This documentation reflected precisely what Plaintiffs' counsel had requested during the deposition of Mr. Ragaie. JA326-28 (seeking a "schedule" that would "reflect what the Ministry has paid in calendar year 2012 and what the cost of the goods was.").

A comparison between ATG's August 2013 production and the original invoices produced by ATG (containing all of the Blue Sky LLC tickets) confirms that ATG produced the backup documentation for invoices it had submitted to the Ministry. For example, the first entry from an original invoice produced by ATG shows ticket number "2357061765308." JA510; JA295. This same ticket number appears in the data produced by ATG in August 2013. JA463 (third entry from the top). As the following chart shows, with simple currency conversion (3.76 Saudi

Riyal ("SR") to the US Dollar), the August production reflects exactly the information included on the invoice:

| Comparison of Ticket Number 2357061765308 | | |
|---|---|---|
| | Arabic Hard Copy Inv. (JA510; JA295, line 1) | August 2013 Production (JA463, third entry) |
| Price (fare + service fee) | 5,805 SR | $1,444 fare + $100 fee (=5,805 SR) |
| Taxes | 1,649 SR | $480 (=1,649 SR) |
| Total (incl. 5% commission) | 7,827 SR | 7,827 SR |

The spreadsheets produced in August 2013 thus reflected all of the information Plaintiffs had requested.  With the ticket numbers, Plaintiffs could also independently verify much of the information, including the ticket price, because of their access to the ARC and International Air Transport Association ("IATA") systems.  JA360-61 (Plaintiffs' counsel:  "I can look and see exactly what they paid for a ticket from the ARC.").  Mr. Ragaie attested that the production "accurately represents the information contained in invoices submitted by ATG to the [Ministry]" (JA576), and at trial testified that the data "contained the actual amounts that we sent to the Ministry" (JA1095-96).

### 6.    Plaintiffs Seek Sanctions From The Court

Just two days after receiving the 5,266 pages of spreadsheets from ATG, Plaintiffs filed a Renewed Motion for Sanctions.  JA449.  Having originally requested only data, they now argued that because the Magistrate Judge's order

had been for ATG to produce "invoices," Plaintiffs now needed not only the information from the invoices but the original Arabic invoices to be able to prove their case. JA449.

The Magistrate Judge held a hearing on Plaintiffs' Renewed Motion on August 30, 2013. ATG's counsel stated that ATG had produced "invoice documents" to Plaintiffs. JA541. ATG's counsel also stated that he would try to get the original Arabic invoices in addition to the invoice data that had already been provided. JA546. He stated that due to the short time frame "we were in a rush. I took what was sent to us and I sent that on to the plaintiff . . . . I wanted to get the documents out that I received from the client to make sure we complied with your . . . deadline." JA548.

The Magistrate Judge stated that "what your client did . . . was to create an Excel spreadsheet. They looked at invoices—they have the invoices, obviously, because the information on the spreadsheet has to come from somewhere. So, there are only two options. They made the information up, or they got the information off the invoices. I didn't order the production of a spreadsheet with invoice information. I ordered the production of the invoices. Your client didn't do that. He is in violation of this Court's order." JA552. The Magistrate Judge did not seem to contemplate the possibility that the extensive spreadsheets had been prepared earlier in the ordinary course of ATG's business.

-16-

The Magistrate Judge stated:  "Under these circumstances, the Court would normally or sometimes order an evidentiary hearing" to put "witnesses on the stand to test credibility . . . ."  JA553.  The Magistrate Judge, however, declined to call an evidentiary hearing.  Instead, he ordered that ATG "shall produce by September 4, 2013 all invoices in their native format similar to the original invoices produced to Plaintiff," that ATG "pay Plaintiff's attorneys' fees and costs for the filing of this Motion and a $50,000 fine," and "that [ATG] is precluded from producing any evidence or arguing . . . at trial that [ATG] makes only a 5 percent markup for all vendors."  JA558.

The only reason that the Magistrate Judge had originally ordered the invoices produced was so that Plaintiffs could test ATG's statement that it had made only a 5% markup across the board.  JA368.  The Magistrate Judge did not explain why these invoices continued to have any relevance after his preclusion order and his earlier acknowledgement that these documents did not relate to profits earned by ATG on tickets sold by Blue Sky LLC.

### 7.    ATG Provided Evidence That In the Ordinary Course Of Business The Original Invoices Had Not Been Retained

ATG searched for the invoices originally sent to the Ministry for all of its vendors in 2012, but in the ordinary course of business following payment by the Ministry, the invoices had not been retained.  JA576.  The spreadsheets produced by ATG and reflecting billing to the Ministry were prepared and kept in the

ordinary course of business.  JA576.  Mr. Ragaie "confirmed that ATG does not retain copies of the original invoices submitted to the [Ministry] after they are submitted and paid by the [Ministry].  ATG regularly submits invoices to [the Ministry] and has been in the practice of reducing the relevant information on these invoices to the [produced] Excel Worksheet for record keeping after they are paid." JA576.

### 8.     The Magistrate Judge Held That ATG Had A Duty To "Preserve All Documents Because You Don't Know What May Or May Not Be Relevant," And Found That ATG Had Spoliated The Original Invoices

In a hearing on September 13, 2013, ATG's counsel explained that in the ordinary course of business, ATG had not retained invoices paid by the Ministry. JA608.  The Magistrate Judge stated that "when this litigation started, the defendants were required by law to preserve.  Any document retention policy you had had to be stopped.  That's the law." JA608-09.  ATG's Counsel explained that "ATG was not put on notice that there would be issues with the other 28 vendors" by the Complaint, document requests, or any other action by the Plaintiffs or the Court.  JA609.

The Magistrate Judge then laid out a bright line rule of law to support his spoliation finding:  Whether ATG was put on notice of issues involving other vendors was "*irrelevant.  Once you are put on notice that there is litigation pending or once litigation starts, you are required, every corporation is required*

*to stop their normal document retention policies and to preserve all documents because you don't know what may or may not be relevant. That's the law.*" JA609-10 (emphasis added). ATG's counsel maintained that this was not the law, and that without notice that invoices related to other vendors would be relevant to the litigation, there was no "legal requirement for [ATG] to retain vendor information for its other 27 vendors." JA610-11.

The Magistrate Judge disagreed and, notwithstanding his conclusion a month earlier that non-Blue Sky LLC invoices were *not relevant* to Blue Sky LLC's case (JA354-55), held that "it appearing to the Court that the defendants have completely failed to fulfill their obligations to preserve documents subsequent to the initiation of this litigation, the Court believes that sanction[s] under the circumstances are appropriate" (JA619). The Magistrate Judge did not make any finding that ATG was or should have been on notice that invoices related to other vendors were relevant to the case, or that ATG had willfully destroyed relevant evidence. Indeed, ATG indisputably had produced all invoices related to tickets purchased by Blue Sky LLC. JA313.

The Magistrate Judge then considered the Fourth Circuit's four-part test for determining what sanctions are appropriate. With regard to bad faith, the Magistrate Judge stated that ATG's counsel had "informed [ATG] inappropriately that they didn't need to preserve these invoices of other vendors because the

invoices of other vendors were not relevant to the claims set forth in the complaint." JA621. Therefore, the Magistrate Judge could not conclude that "the defendants themselves acted in bad faith. The Court has some serious concerns in regards to the conduct of defendants' counsel however." JA621.

On prejudice, the Magistrate Judge stated that "without having the documents, we don't know exactly what was on the documents and what information could have been gleaned from it to assist the plaintiffs in proving their case." JA620. The Magistrate Judge therefore found that "prejudice can be presumed because we don't know what was in the documents." JA621. Without any evidentiary hearing, the Magistrate Judge refused to credit Mr. Ragaie's affidavit (JA576), which attested that ATG's production accurately reflected the information in the invoices submitted to the Ministry (JA618).

The Magistrate Judge further found that "the need for deterrence of such conduct in further litigation is extremely high," without elaboration. JA620.

Finally, with regard to whether less drastic sanctions would be effective, the Magistrate Judge initially stated that he did not believe he could instruct the jury that ATG's profits were $20 million because "the Court doesn't know what the amount of profit was. The Court doesn't have the documents." JA622. The Magistrate Judge instead considered an instruction that "the information on those

invoices [related to non-Blue Sky LLC vendors] would have assisted the plaintiffs in proving their damages claim." JA622-23.

Plaintiffs' counsel, however, maintained that Plaintiffs did have proof regarding the $20 million in profits, namely that Mr. Riad had stated in his deposition that Dr. Al-Tayyar had told him he should expect to earn $5-$6 million from the arrangement via his 51% interest in Blue Sky LLC, which would mean that ATG would have earned around $20 million in profit to split with Blue Sky LLC. JA623. Plaintiffs' counsel did not provide the Magistrate Judge with any documents or affidavits to support this representation, and omitted to add that Mr. Riad had stated in an affidavit that the $5-$6 million would be his *annual* profit (JA381), while Blue Sky LLC in fact had purchased Ministry tickets for less than two months (JA843). Based solely on the representations made by Plaintiffs' counsel, and without any evidentiary hearing, the Magistrate Judge determined that the jury should receive an instruction to presume that ATG's profits were $20 million. JA631; JA634.

### 9. ATG Challenged The Magistrate Judge's Rulings

On September 17, 2013, Defendants filed a Rule 72 exception to the Magistrate Judge's August 30, 2013 and September 13, 2013 orders with the District Court. JA635. Defendants did not challenge the Magistrate Judge's August 30, 2013 order that ATG could not argue at trial that it made a 5% markup

for all vendors, as Defendants had stated during the August 2, 2013 hearing that they did not intend to raise that issue at trial.  JA364.

Plaintiffs' Counsel admitted that there was no way in which ATG could rebut the presumption given the Magistrate Judge's twin orders that profits should be presumed and that ATG was precluded from arguing that its profits were 5% with respect to other vendors.  JA715-16.  The District Court issued an order the same day affirming the Magistrate Judge's Orders, and asserting, without elaboration, that ATG's failure to produce the original invoices for non-Blue Sky LLC vendors "effectively limited, if not entirely eliminated, plaintiffs' opportunity to establish the damages they were claiming."  JA748.

### 10.    Plaintiffs Used The District Court's Orders To Attack Defendants' Credibility At Trial

In an effort to avoid suffering further prejudice from the Court's presumption, ATG requested prior to trial, and Plaintiffs agreed, that the question of damages be submitted to the District Court rather than the jury.  JA768.

Still, Plaintiffs used the Magistrate Judge's orders to attack ATG's credibility before the jury.  For example, Plaintiffs' counsel spoke extensively in opening statement about the Magistrate Judge's orders:  "[Defendants] have been ordered to produce those on no less than four different occasions.  They refuse to do it. . . . Finally, after a series of hearings, they were ordered to produce the actual invoices. . . . Well, on the last day . . . we hear, Oh, we don't have those anymore.

We destroyed them." JA809. Plaintiffs asserted that ATG's production of spreadsheets "were not, in fact, invoices issued to the Ministry, and they didn't comply with this Court order. So now you do not have to determine the amount of the damages. The Court has already taken care of that aspect of it for you." JA810.

Plaintiffs' counsel added that the jury should not trust ATG because it had not complied with the Court's orders: "So in this case, you'll see that somebody [Plaintiff] is willing to stand by his word . . . . You'll see from the other side, *We're not going to give you the documents. We're going to make up lots of stories. We're going to tell the Court that we provided the invoices and then have to admit that, no, we did not. We're not going to have any respect for you or this Court. We're going to thumb our nose at the process*." JA810 (emphasis added).

Plaintiffs pressed this point during the trial testimony of ATG's Mr. Ragaie, asking: "Did you send the copies [of original invoices] as was ordered by this Court?" JA1095. ATG objected, but was overruled by the District Court. JA1095; *see also* JA909. Twice more, Plaintiffs questioned Mr. Ragaie as to why invoices "ordered by this Court" were not produced. JA495-96. Mr. Ragaie explained that the actual bills sent were not retained after they had been paid, but that the information produced "contained the actual amounts that we sent to the Ministry." JA495-96.

At trial, Mr. Riad was the only witness who testified to the existence of an oral agreement between himself and Dr. Al-Tayyar under which Blue Sky LLC and ATG would share profits. Despite asserting that he should receive millions of dollars in profits for a mere few weeks of work, Mr. Riad apparently never wrote down in any form the terms of his purported agreement. JA869-70, 874-76.

On September 25, 2013, at the conclusion of the three-day trial, the jury returned a verdict finding that there was an "oral contract" to split profits and that ATG had breached its terms. JA1245.

### 11. The District Court Determined That ATG Cannot Overcome The Evidentiary Presumption

The unrebutted evidence presented at trial was that the invoices produced by ATG were the only invoices that ATG submitted to the Ministry containing Blue Sky LLC tickets, and totaled around $800,000. JA1084-85, 1087-88. ATG's witnesses testified that no other invoices containing Blue Sky LLC tickets had been submitted to the Ministry due to documentation issues. JA1089-90.

ATG was not allowed to present evidence regarding damages during trial, but proffered to the District Court that it would have offered evidence that: (1) ATG only made 5% profit on the resale of Blue Sky LLC tickets to the Ministry; (2) ATG only billed the Ministry for $840,000 worth of the tickets purchased by Blue Sky LLC, and received no more than $42,000 in profits; and (3) the oral agreement and expected profits alleged by Mr. Riad at trial was to be

for profits derived from a year's worth of ticket sales, but damages here should be based solely on the profits from the eight-week period in 2012 during which Blue Sky LLC purchased tickets for ATG for resale to the Ministry. *See* JA1239-40; JA1312. The District Court found that ATG could not rebut the presumption of $20 million in profits, and therefore awarded damages to Blue Sky LLC in the amount of $10 million under the alleged profit-sharing agreement. JA1313.

## SUMMARY OF ARGUMENT

This appeal presents two questions of law, both of which were answered incorrectly by the District Court. First, does an oral agreement allegedly made in June 2011 and not to be fully performed until 18 months later (at the end of 2012) fall within Virginia's Statute of Frauds? The answer: Yes, Virginia's Statute of Frauds bars enforcement of any alleged oral agreement "that is not to be performed within a year." Va. Code § 11-2(8).

The District Court erred by holding that if there were some hypothetical excuse for non-performance, then Virginia's Statute of Frauds would not apply. JA1310 (stating there were theoretical possibilities that would "eliminat[e] any possible need for any performance"). Under controlling decisions by the Supreme Court of Virginia, however, Virginia's Statute of Frauds applies to an alleged oral agreement unless the agreement can be *performed* within a year; the possibility that the oral agreement may be terminated or that performance may otherwise be

excused within a year does not take the agreement outside the Statute. *Falls v. Va. State Bar*, 397 S.E.2d 671, 672-73 (Va. 1990); *Silverman v. Bernot*, 239 S.E.2d 118, 121-22 (Va. 1977). Here, based on the testimony of the sole witness who testified to the existence of an oral agreement to split profits (Plaintiff Mr. Riad), the alleged oral agreement could not be performed within a year. Accordingly, Virginia's Statute of Frauds applies to the alleged oral agreement, rendering it unenforceable.

The second question to be answered, if necessary, is whether the Magistrate Judge, affirmed by the District Court, was correct in stating that parties have the legal duty, once litigation commences, to preserve "all documents because you don't know what may or may not be relevant"? JA609-10. The answer is: No, a party is required to preserve only documents which it "knows, or reasonably should know, [are] relevant in the action, [are] reasonably calculated to lead to the discovery of admissible evidence, [are] reasonably likely to be requested during discovery, and/or [are] the subject of a pending discovery request." *E.I. Du Pont De Nemours & Co. v. Kolon Indus., Inc.,* 803 F. Supp. 2d 469, 496 (E.D. Va. 2011) (citation omitted); *see also Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013) (requiring for spoliation that "the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case"). The Magistrate Judge's erroneous statement of law was used as the basis for a spoliation finding

against Defendants. The Magistrate Judge then presumed prejudice, presumed the need for deterrence, and issued a presumption for the jury that ATG had earned $20 million in profits from Blue Sky LLC ticket sales. These presumptions were clearly erroneous and an abuse of discretion.

The Magistrate Judge's spoliation finding was based solely on the failure to retain original invoices for vendors *other than* Blue Sky LLC. But the only issue of profits in the case was ATG's profits on the resale of Blue Sky LLC tickets, not ATG's profits on the resale of tickets from other vendors. Moreover, although ATG, in the ordinary course of business, did not retain the original, non-Blue Sky LLC invoices, ATG did preserve the information from those invoices in the ordinary course of business, and produced 5,266 pages of spreadsheets showing that information (including the cost of the tickets and the across-the-board 5% profit on resale). ATG acted responsibly, and Blue Sky LLC was not prejudiced in any way.

The Magistrate Judge's spoliation finding and evidentiary sanction, affirmed by the District Court, infected the trial due to Plaintiffs' opportunistic use of the sanctions to attack Defendants' credibility before the jury. The Magistrate Judge also denied Defendants the opportunity to present evidence regarding profits earned on the resale of Blue Sky LLC tickets, and instead directed a finding, without an evidentiary basis, that Defendants' profits were $20 million.

Defendants are entitled to a new trial so that they may present their case without an erroneous spoliation finding and evidentiary sanction.

## ARGUMENT

## I. VIRGINIA'S STATUTE OF FRAUDS BARS ANY ACTION ON THE ALLEGED ORAL AGREEMENT

### A. This Court Reviews *De Novo* A District Court's Denial Of A Motion For Judgment As A Matter Of Law

Defendants raised the Statute of Frauds both at the close of Plaintiffs' case and at the close of all the evidence as a motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure.  JA996-1025; Dkt. 198; *see also* JA146.  This Court reviews *de novo* a district court's denial of a motion for judgment as a matter of law.  *See Belk, Inc. v. Meyer Corp. U.S.*, 679 F.3d 146, 164 (4th Cir. 2012).  This Court reviews the jury's factual findings "in the light most favorable to the prevailing party" but must reverse if a reasonable jury could not legally return a verdict in favor of Plaintiffs.  *Id.*

### B. Virginia's Statute Of Frauds Bars Any Action On Any Oral Agreement That Is Not To Be Performed Within A Year

Virginia has codified the Statute of Frauds, including a requirement that bars recovery on any oral agreement where performance cannot take place within a year:  "Unless a promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, is in writing and signed by the

party to be charged or his agent, no action shall be brought . . . [u]pon any agreement that is not to be performed within a year." Va. Code § 11-2(8).

The Statute of Frauds was originally incorporated into English law in the 17th Century "to prevent the enforcement of unfounded fraudulent claims by requiring written evidence." 9 Richard A. Lord, Williston on Contracts § 21:1 (4th ed. 1990). To this day, "[t]he Statute of Frauds . . . reflects concerns about the reliability of oral evidence." *Gen. Dynamics Corp. v. United States*, 131 S. Ct. 1900, 1908 (2011). Its "primary object [is] to prevent the setting up of pretended agreements and then supporting them by perjury." *Lindsay v. McEnearney Assoc., Inc.*, 531 S.E.2d 573, 575 (Va. 2000); *see also Logistics Transp. Co., Inc. v. Timber Trucking Co., Inc.*, 141 F.3d 1158, 1998 WL 200321, at *2 (4th Cir. 1998) (unpublished) ("The purpose of the statute of frauds is to prevent frauds based upon oral proof of purported contracts.").

If some portion of an alleged oral agreement cannot be performed within a year, then all parts of the agreement fall within the Statute of Frauds. *Engleby v. Harvey*, 25 S.E. 225, 226 (Va. 1896) ("Where such promise is entire, as was the case here, and it relates in part to a matter which renders it necessary under the statute of frauds that the promise should be in writing, the whole promise is void."); *see also* Restatement (Second) of Contracts § 130 cmt. d (1979) ("If either party promises a performance that cannot be completed within a year, the Statute

applies to all promises in the contract, including those which can or even must be performed within a year."); *Nycal Offshore Dev. Corp. v. U.S.*, 92 Fed. Cl. 209, 212 (2010) ("[W]hen part of a contract is unenforceable because of the statute of frauds . . . the presumption is that the entire contract is unenforceable.").

### C.  The Alleged Oral Agreement Here Could Not Be Performed Within A Year

Taking the evidence in the light most favorable to Plaintiffs—from the only witness to testify to the existence of the purported oral agreement, Mr. Riad—there was an oral agreement between Mr. Riad and Dr. Al-Tayyar in June of 2011. JA832 (Riad:  "Q. . . . [W]hat did you do to evidence that you had come to an agreement?   A. Shook hands.").   Mr. Riad testified that there was no written agreement made, because "it would be disrespectful."  JA832.

Pursuant to the terms of the purported June 2011 oral agreement, Mr. Riad would shut down his then-existing business and be ready to take orders for Blue Sky LLC in the spring of the following year.   JA834-36 (Riad:  stating he "start[ed] closing" his previous business which took "toward the end of the year" to "finaliz[e] all the old orders" and then transferred the ARC number "[i]n February 2012"); *see also* JA1012-13 (Plaintiffs' counsel:  "[C]learly, the initial conversations were, [y]ou're going to get ready to go to work in the spring of 2012.").  Blue Sky LLC would then purchase the tickets and service those tickets until they were used by the Saudi students later that year.  JA841 (Riad:  stating he

kept his business open until "January 18, 2013," "after the last student used his ticket"); *see also* JA971 (Sherin Noor: "Students travel to Saudi Arabia, and they are supposed to come back in December. And they have some emergency or something. So they didn't come back, and they need to exchange the ticket, change the date of travel. And because we issued the ticket, we need to make the exchange."). At the close of 2012, ATG and Blue Sky LLC would split the profits from the business. JA828 (Riad: "At the end of the year, . . . we will split the profits.").

On its face, this alleged agreement could not be performed by the parties in a year. The agreement called for Blue Sky LLC to purchase and service tickets for Saudi students, but that would not even begin until Spring 2012. JA834-36, 1012-13. In fact, no tickets were even ordered until May 2012—11 months after the alleged oral agreement. JA843. Blue Sky LLC would then service the tickets through at least December 2012, at which time the parties would determine and split their profits. JA798, 828, 830, 841, 971, 1012. This purported agreement fits squarely within Virginia's Statute of Frauds, as an oral agreement that could not "be performed within a year." Va. Code § 11-2(8).

The purported June 2011 oral agreement rests solely on the testimony of Mr. Riad, who was both the main beneficiary of the alleged agreement and the only witness who testified as to its terms. Despite claiming that he was due

millions of dollars, he never memorialized the terms of the agreement in any writing whatsoever. JA869-70, 874-76. This testimony of an oral agreement, based solely on the word of one man with millions to gain, is exactly the reason that the Statute of Frauds exists: "to prevent the setting up of pretended agreements and then supporting them by perjury." *Lindsay*, 531 S.E.2d at 575 (citation omitted).

### D. The District Court Erred By Holding That Defendants Bore The Burden Of Proof To Disprove Contingencies

In denying Defendants' motion for judgment as a matter of law, the District Court erroneously placed the burden of proof on Defendants to prove that there was no possible contingency that would remove the alleged oral agreement from the Statute of Frauds. JA1309. Putting aside for the moment that the District Court looked for the wrong type of contingencies, *see infra* 36-40, the District Court—contrary to both precedent and logic—required Defendants to have disproved at trial every possible contingency that the Court could "conjure up . . . no matter how improbable." JA1309. The District Court imposed this requirement on Defendants even though Defendants were not given any notice of what contingencies they would have to disprove at trial. Indeed, the contingencies upon which the Court ultimately relied after trial—that the Ministry would not order any tickets or could terminate its contract with ATG—were never contemplated or raised by the parties at trial.

Virginia law is clear that Defendants bore the *initial* burden of making a *prima facie* case that the Statute of Frauds applied to the alleged oral agreement, but Virginia's law is equally clear that *Plaintiffs* then bore the burden of showing circumstances that would remove the oral agreement from the Statute of Frauds. As the Supreme Court of Virginia stated long ago: "At law a defendant may insist upon the benefit of the statute [of frauds] . . . . This general denial will put the plaintiff to the proof of the agreement." *Eaves v. Vial*, 34 S.E. 978, 980 (Va. 1900); *see also Lewis v. Payne*, 27 Va. Cir. 194, *1 (1992) ("[T]he burden should fall upon the party who seeks to establish the existence of a valid, enforceable contract . . . . This is consistent with the application of the Statute of Frauds which places the burden of proof upon the party who seeks to enforce the contract.").

The District Court cited two Virginia cases in support of the argument that Defendants bore the burden of proof.  In both cases, however, the defendants failed to meet their *initial* burden of showing that the Statute of Frauds applied at all.  *See Baker v. Jim Walter Homes, Inc.*, 438 F. Supp. 2d 649, 652 (W.D. Va. 2006) (finding defendants had not met their burden of showing that the contract related to real estate for purposes of the Statute of Frauds); *Agbey v. Dalloul*, 41 Va. Cir. 3 (1996) (finding defendants had not put forward any evidence at all that the oral contract could not be performed within one year).

-33-

The District Court also cited a recent case from the Texas Supreme Court, in which defendant "pled the statute of frauds as an affirmative defense and thus had the initial burden to establish that the alleged promise fell within the statute of frauds." JA1309 (quoting *Dynegy, Inc. v. Yates*, No. 11-0541, 2013 WL 4608711, at *3 (Tex. Aug. 30, 2013)). But the District Court failed to recognize that the Texas Supreme Court expressly held that once a "party meets its *initial* burden [of showing the Statute of Frauds applies], *the burden shifts* to the opposing party to establish an exception that would take the verbal contract out of the statute of frauds." *See Dynegy*, 2013 WL 4608711, at *2 (emphasis added); *see also Micromedia v. Automated Broad. Controls*, 799 F.2d 230, 235 (5th Cir. 1986) ("[Defendant] pleaded the statute of frauds as a defense, and [Plaintiff] failed in its burden to establish facts that would take the case out of the statute of frauds."); *E.F. Hutton & Co., Inc. v. Berns*, 682 F.2d 173, 180 (8th Cir. 1982) ("The plaintiff-appellee in this case had the burden of proving . . . evidence . . . which would take this alleged oral guaranty out of the statute of frauds.").

The contrary rule, adopted by the District Court, would require Defendants to rule out every possible theoretical contingency that could be "conjure[d] up" by the District Court, "no matter how improbable." JA1309. Despite the fact that the Ministry's obligations to ATG under its contract were not disputed at trial, the District Court ruled against ATG because "[n]o evidence has been offered

-34-

concerning how the Ministry contract would be construed under Saudi law, either with respect to the term of that contract . . . or the obligations of the Ministry under that contract."  JA1309, n.2.  ATG had no notice that at trial it would need to provide experts in Saudi law or witness testimony to set forth facts which were undisputed by the parties.

Moreover, even had ATG disproved this contingency by putting forth expert testimony, witnesses, and documents on this undisputed issue, there is no guarantee that the District Court could not "conjure up" another "improbable" contingency (JA1309) that ATG had failed to disprove.  The simple common-sense rule applied by the Supreme Court of Virginia (and courts elsewhere) is that Defendants have the initial *prima facie* burden of showing that the Statute of Frauds applies—in this case, by establishing through Plaintiffs' own testimony that pursuant to the terms of the alleged oral agreement the profit-sharing would not occur until 18 months later—and that the burden then shifts to the Plaintiffs to show some contingency or other reason why the alleged oral agreement should not be within the Statute of Frauds.

Having raised the Statute of Frauds in the District Court and presented evidence showing that the alleged oral agreement was "not to be performed within a year," Va. Code § 11-2(8), Defendants fully satisfied their *prima facie* burden of

proof.  The District Court erred by not then shifting the burden to Plaintiffs to show some reason why the Statute of Frauds should not apply.

### E.   Plaintiffs Did Not And Cannot Prove That The Oral Agreement Could Be Performed Within A Year

Even more fundamental than the misapplication of the burden, the District Court's ruling relied on the wrong type of contingency.  Plaintiffs and the District Court relied upon the speculative argument that if there were "no orders to Blue Sky [LLC] to purchase the tickets"—either due to the Ministry's failure to order any tickets or termination of its contract with ATG—then there would be "no profits to be shared," and thus no performance due outside of the one year time frame.  JA1309-10.  Then, in a legal non sequitur, the District Court stated that because these contingencies would "eliminate any possible need for any performance" this meant that the "parties might have completed their performance under their contract within a year of June 2011."  JA1310.

The District Court's reasoning is legally erroneous.  A contingency that "eliminate[s] any possible need for any performance" (JA1310) is not the same thing as a contingency which allows an agreement actually to be "performed within a year."  Va. Code § 11-2(8).  The Supreme Court of Virginia is clear that only a contingency which would allow for "full performance" of an oral agreement within a year would remove the oral agreement from the Statute of Frauds.  *Falls v. Va. State Bar*, 397 S.E.2d 671, 672-73 (Va. 1990); *see also Silverman v. Bernot*,

-36-

239 S.E.2d 118, 123 (Va. 1977) (distinguishing "between the performance of a promise on the one hand, and an excuse for nonperformance on the other").

In *Falls*, the plaintiff argued that the oral agreement at issue was not within the statute because it would have been fully performed within a year upon the plaintiff's death, resignation, or discharge for cause. *Falls*, 397 S.E.2d at 672-73. The Supreme Court of Virginia rejected this argument and stated that "[a]lthough occurrence of any of the three contingencies mentioned by Falls would have terminated his performance during the first year of his employment, the parties' contract did not expressly provide that the occurrence of any of these contingencies would constitute full performance. Absent such an agreement, upon occurrence of any of those contingencies, Falls' contract would end, not by performance, but by termination." *Id.*; *see also Silverman*, 239 S.E.2d at 121 ("[I]t is generally recognized that termination of duty by operation of law is not identical with performance of a promise. The death of a party may terminate duty; but the contemplated work has not been done.") (citation omitted); *Haigh v. Matsushita Elec. Corp. of Am.*, 676 F. Supp. 1332, 1348 (E.D. Va. 1987) (discussing the "distinction between full performance and excusing performance" for purposes of the one-year provision of the Statute of Frauds).

Other legal authorities are in agreement: "Any contract may be discharged by a subsequent agreement of the parties, and performance of many contracts may

-37-

be excused by supervening events or by the exercise of a power to cancel granted by the contract.  The possibility that such a discharge or excuse may occur within a year is not a possibility that the contract will be 'performed' within a year." Restatement (Second) of Contracts § 130 cmt. b; *see also* 4 Caroline N. Brown, Corbin on Contracts § 19.9 (Joseph M. Perillo ed., rev. ed. 1997) ("In many cases, a contractual duty will be discharged by operation of law in case the promised performance becomes physically impossible or legally forbidden.  Frequently it can be said that such impossibility or prohibition may occur within one year, and yet the rule is that the contract is nevertheless within the one-year clause.  The reason is that the parties themselves made no such provision, either expressly or by reasonable implication.").

The hypothetical failure of the Ministry to order any tickets from ATG or the Ministry's termination of ATG's contract would have resulted in an excuse for non-performance of the alleged oral agreement.  It would *not* have resulted in full performance of the parties' contract, which required Blue Sky LLC to purchase and service airline tickets, ATG to compensate Blue Sky LLC for those tickets, and the parties to share profits eighteen months later at the end of 2012.  None of these terms would have been fully performed—either by Blue Sky LLC or ATG—had the Ministry failed to order tickets or terminated its contract with ATG prior to any ticket orders.

Under Virginia law, in order for Plaintiffs to prove that a failure by the Ministry to order tickets would qualify as full performance of the contract, Plaintiffs would have to prove that the parties had "expressly provided" such in their oral agreement. *See Falls*, 397 S.E.2d at 672-73 (following *Silverman*, 239 S.E.2d at 122). No evidence was presented at trial that the parties expressly provided that their contract would be deemed fully performed should the Ministry fail to order tickets from ATG or terminate its contract with ATG. Such a contingency, therefore, while perhaps resulting in the elimination of "any possible need for any performance by Blue Sky or ATG" (JA1310), would not have constituted "full performance" of the contract under controlling Virginia law or removed the alleged oral agreement from the Statute of Frauds. *Silverman*, 239 S.E.2d at 121 ("When it appears by the whole tenor of an agreement not in writing that it is to be performed after the first year, then the contract is within the statute and must be in writing.").

Oddly, in reaching its erroneous ruling the District Court ignored a remarkably similar case on this point from its own district—even though ATG strongly relied upon the case. In *Albanese v. WCI Cmty., Inc.*, 530 F. Supp. 2d 752 (E.D. Va. 2007), the Eastern District of Virginia determined that Virginia's Statute of Frauds applied to an oral employment agreement made in August 2004 with the promise of a bonus to be calculated and paid at the end of 2005. Because the

calculation and payment of the bonus was to be made fifteen months in the future, the oral agreement could not be performed within a year of the agreement. *See Albanese*, 530 F. Supp. 2d at 765. It did not matter that the employment could be terminated as a matter of law within a year. *Id.* at 761. *Albanese* therefore held that the Statute of Frauds applied, preventing any recovery under the oral contract. *Id.*

In the same manner here, no calculation and division of profits as contemplated by the alleged oral agreement could happen before the end of 2012, eighteen months after the alleged oral agreement. Accordingly, the Statute of Frauds applies to the alleged oral agreement. This Court should vacate the judgment of the District Court and order that Plaintiffs take nothing on their claims, all of which are based on the same unenforceable oral agreement.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION BY IMPOSING EVIDENTIARY SANCTIONS ON ATG FOR FAILURE TO "PRESERVE ALL DOCUMENTS BECAUSE YOU DON'T KNOW WHAT MAY OR MAY NOT BE RELEVANT"

### A. This Court Reviews A District Court's Imposition Of Sanctions Under An Abuse Of Discretion Standard, And An Error Of Law Constitutes An Abuse Of Discretion

The District Court affirmed the Magistrate Judge's ruling that ATG had spoliated documents and that ATG should be sanctioned with a presumption that the profits made on ATG's resale of Blue Sky LLC tickets to the Ministry were $20 million. JA748-49. Evidentiary sanctions are a matter of federal law and this

Court reviews a district court's imposition of sanctions under the abuse of discretion standard. *See Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) ("We review the district court's exercise of its discretion [in imposing spoliation sanctions] for abuse."). A misstatement of law, or a clear misapprehension of the relevant facts, by a district court is an abuse of discretion. *See Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.").

### B.     The District Court's Spoliation Finding Was Based On An Error Of Law

At the September 13, 2013 motions hearing, Defendants' counsel—supported by an affidavit from Mr. Ragaie—reported that, in the ordinary course of business, the original invoices submitted to the Ministry for vendors other than Blue Sky LLC were not retained, and that they had not been preserved because ATG was not on notice that they were relevant to the case. JA608; JA576.

The Magistrate Judge stated: "Once you are put on notice that there is litigation pending or once litigation starts, you are required, every corporation is required to stop their normal document retention policies and to *preserve all documents because you don't know what may or may not be relevant. That's the law.*" JA609-10 (emphasis added). But that is not the law.

It is well-established that "[c]orporations are not obligated, 'upon recognizing the threat of litigation,' to 'preserve every shred of paper, every e-mail or electronic document, and every backup tape.'" *Samsung Elecs. Co. v. Rambus, Inc.*, 439 F. Supp. 2d 524, 542-43 (E.D. Va. 2006) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003)), *vacated on other grounds*, 523 F.3d 1374 (Fed. Cir. 2008). Indeed, "[s]uch a rule would cripple large corporations" like ATG. *Samsung*, 439 F. Supp. 2d at 543. Rather, "[a] party that anticipates litigation . . . is 'under a duty to preserve what it knows, or reasonably should know, *is relevant in the action*, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request.'" *E.I. Du Pont De Nemours & Co.*, 803 F. Supp. 2d at 496 (quoting *Samsung*, 439 F. Supp. 2d at 543) (emphasis added).

Therefore, "[a] party seeking sanctions based on the spoliation of evidence must establish, inter alia, that the alleged spoliator had a duty to preserve material evidence." *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013). Furthermore, "spoliation does not result merely from the negligent loss or destruction of evidence. Rather, *the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case*, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction." *Id.* (emphasis

added); *see also Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) ("An adverse inference . . . requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction.").

The Magistrate Judge did not conduct any evidentiary hearing, nor did he make any factual finding that ATG knew at the time the documents were not retained that they were relevant to some issue in the case or that ATG had willfully discarded the documents knowing that they were relevant. Indeed, as the Magistrate Judge had earlier stated: "[I]nvoices that have nothing about Blue Sky LLC, this Court was like, how could that be relevant." JA360; *see also* JA354-55 (Magistrate Judge: "[T]hings that aren't related to Blue Sky cannot be reasonably calculated to lead to the discovery of admissible evidence on behalf of Blue Sky's theory."); JA326-28 (Plaintiffs sought only a "schedule" that would "reflect what the Ministry has paid in calendar year 2012 and what the cost of the goods was.").

It is undisputed that Plaintiffs' claims for profits related solely to tickets handled by Blue Sky LLC, and not to any other vendors. JA701. There was nothing relating to other vendors in Plaintiffs' complaints (Dkt. 1; JA67), or in Plaintiffs' Document Requests (JA116). On June 18, 2013, Plaintiffs' counsel for the first time orally requested data, not actual invoices, from ATG's systems regarding the charges to the Ministry and the cost to ATG of the tickets for other

vendors, but still did not request the original Ministry invoices. JA323. Moreover, the oral request did not constitute a proper request for the data. *See, e.g.*, *Roberts v. Americable Int'l Inc.*, 883 F. Supp. 499, 501 n.2 (E.D. Cal. 1995) (stating an "informal request for production of documents made at a deposition is not recognized as an appropriate discovery request under the . . . Federal Rules of Civil Procedure").

ATG was not put on notice that it should preserve original Ministry invoices related to non-Blue Sky LLC vendors until at least August 2, 2013 (JA374)—after the close of discovery (JA28). So it is hardly surprising that ATG had employed its regular document retention policies with respect to those invoices, as Mr. Ragaie explained: "ATG does not retain copies of the original invoices submitted to the [Ministry] after they are submitted and paid by the [Ministry]. ATG regularly submits invoices to [the Ministry] and has been in the practice of reducing the relevant information on these invoices to the Excel Worksheet for record keeping after they are paid." JA576.

ATG produced 5,266 pages of these Excel Worksheets to Plaintiffs, which Mr. Ragaie further attested were the business records preserving the relevant information from those invoices. JA576. The Magistrate Judge did not conduct any evidentiary hearing to assess Mr. Ragaie's credibility and, in fact, assumed that

-44-

Mr. Ragaie had properly stated ATG's document retention policy. JA608 ("Any document retention policy you had had to be stopped.").

The Magistrate Judge's spoliation finding, as affirmed by the District Court, was based squarely on the erroneous legal ruling that ATG had a duty to preserve "all documents" whether relevant or not. But under this Court's reasoning in *Turner*, since there was no finding that ATG was on notice that these documents were relevant to the case, there can be no finding of spoliation. 736 F.3d at 282.

In *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68 (3d Cir. 2012), the Third Circuit recently held that severe sanctions based on purported spoliation of original documents could not stand when there was no evidence that the opposing party had submitted a proper document request or actually requested originals (rather than copies). *Id.* at 74. With no evidentiary hearing or findings of fact by the district court, there was simply no evidence that the documents had been intentionally withheld or destroyed, and the Third Circuit held that the district court had thus abused its discretion. *Id.* at 79. The Third Circuit also noted that with modern electronic documents, "[t]here are—and increasingly will be—circumstances in which the foreseeability of a duty to preserve the information contained in a particular document is distinguishable—under an objective analysis—from the need to preserve that information in its 'original' form or format." *Id.* at 78 n.12.

ATG, in the ordinary course of business, preserved the information contained in the original invoices, but, under its normal document retention policies, did not retain the original invoices. JA576. With no finding that the documents were relevant or that ATG knowingly destroyed relevant documents, the Magistrate Judge's spoliation finding—based upon an error of law that ATG had a duty to preserve "all documents"—was an abuse of discretion and should be reversed.

### C.    The District Court's Evidentiary Sanction, Based On The Erroneous Spoliation Finding, Was An Abuse Of Discretion

As this Court recognized in *Silvestri*, "[w]hile a district court has broad discretion in choosing an appropriate sanction for spoliation, the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." 271 F.3d at 590 (citation omitted). This Court uses a four-factor test to determine the appropriate sanction for spoliation: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998). While a district court enjoys considerable latitude in determining an appropriate sanction, this Court recognizes that there are also limits to such discretion. *See Wilson v.*

*Volkswagen of Am., Inc.*, 561 F.2d 494, 503 (4th Cir. 1977) ("The power to impose sanctions . . . is not . . . a discretion without bounds or limits but one to be exercised discreetly and never when it has been established that failure to comply has been due to inability, and not to willfulness, bad faith, or any fault of (the non-complying party).").

### 1. The Magistrate Judge Did Not Find That Had ATG Acted In Bad Faith

While the Magistrate Judge stated that ATG's counsel may not have adequately informed ATG that it had to preserve "all documents," the Magistrate Judge stated that he could not find that ATG had acted in bad faith. JA621. This Court has observed that "[w]here a district court determines that there was no bad faith, that determination will likely be reflected in a less severe sanction." *Law Enforcement Alliance of Am., Inc. v. USA Direct, Inc.*, F. App'x 822, 831 (4th Cir. 2003) (unpublished).

### 2. The Magistrate Judge Erroneously Presumed Prejudice Because He Did Not Know What Was In The Allegedly Spoliated Documents

With regard to prejudice, the Magistrate Judge stated that "without having the documents, we don't know exactly what was on the documents and what information could have been gleaned from it to assist the plaintiffs in proving their case." JA620. The Magistrate Judge therefore found that "prejudice can be presumed because we don't know what was in the documents." JA621. Yet,

courts finding prejudice have required a finding of clear prejudice and not simply assumed prejudice. *See, e.g.*, *Kolon Indus. v. E.I. Du Pont De Nemours & Co.*, No. 3:11cv622, 2012 WL 664239, at *3 (E.D. Va. Feb. 28, 2012) ("Dupont has *clearly* suffered prejudice as a result of Kolon's non-compliance with the September 16 Order.") (emphasis added); *Nettles v. Costco Wholesale Corp., Inc.*, No. 1:06-CV-847, 2006 WL 3299990, at *4 (E.D. Va. Oct. 20, 2006) ("As a result of plaintiff's conduct, defendant has not been able to issue subpoenas for documents, interview witnesses, schedule depositions, select experts, or provide expert disclosures. By any standard, defendant will be unfairly prejudiced absent dismissal.").

Here, there was no finding of prejudice as to Plaintiffs, nor could there have been. During discovery, Plaintiffs never once requested that ATG produce any invoices related to non-Blue Sky LLC vendors and, in any event, ultimately received spreadsheets containing the precise information Plaintiffs belatedly claimed they needed from those invoices. Nor were these documents relevant to their case. JA354-55. Plaintiffs had all of the information necessary to their case, and the Magistrate Judge, affirmed by the District Court, committed clear error by simply presuming prejudice without any actual finding of prejudice.

The Magistrate Judge, moreover, was factually incorrect in stating that "we don't know what was in the documents." JA621. Mr. Ragaie attested that the

information provided in the spreadsheets accurately reflected the Ministry invoices. JA576. As discussed above, a simple comparison between the spreadsheets and the invoices produced shows that the spreadsheets confirmed Mr. Ragaie's attestation. *See supra* 14-15. Without any evidentiary hearing or assessment of Mr. Ragaie's credibility, the Magistrate Judge refused to give any credit to Mr. Ragaie's affidavit solely because he was ATG's witness. JA618 ("[N]o one sitting in this courtroom *except the defendants* have any information in their possession that would prove to [Plaintiffs] that the information contained on those spreadsheets is accurate." (emphasis added)). Where the finding of prejudice is "unsupported by any detailed explanation" and is not supported by the surrounding facts, as is the case here, the finding is "clearly erroneous." *See Procter & Gamble Co. v. Haugen*, 427 F.3d 727, 740 (10th Cir. 2005).

### 3. The Magistrate Judge Erroneously Found Without Any Justification That The Need For Deterrence Was "Extremely High"

The Magistrate Judge then stated that the need for deterrence of this conduct—failing to preserve "all documents" whether relevant or not—was "extremely high." JA620. The Magistrate Judge did not explain his reasoning, but seemingly based this statement on the failure by Defendants' counsel to inform ATG at the beginning of litigation that "all documents," whether relevant or not, must be preserved. As discussed above, however, the Magistrate Judge's view of

-49-

the law was clearly erroneous, and there is absolutely no need to deter parties from employing their normal document retention policies with regard to documents the relevance of which the parties have no notice.

While compliance with legal obligations to preserve evidence is unquestionably essential to the proper functioning of the adversarial system, deterrence is needed only where a litigant in fact violates those legal obligations. *Wu v. Tseng*, No. 2:06cv580, 2008 WL 4360990, at *5 (E.D. Va. Sept. 22, 2008) (finding deterrence needed where "[t]hese defendants have shown an unwillingness to comply with the most basic types of discovery requests").

### 4. The Magistrate Judge Erroneously Imposed A Disproportionately Severe Evidentiary Sanction

The Magistrate Judge found that—based upon ATG's failure to retain original invoices for non-Blue Sky LLC vendors—the jury should be told to "presume that the profits made on Blue Sky [LLC's] ticket sales to [ATG] and resold to the [Ministry] were 20 million dollars." JA634. As Plaintiffs' counsel admitted, due to the Magistrate Judge's other orders, there was no way that ATG could rebut the presumption or present a defense on damages. JA716-17. So the Magistrate Judge's order, affirmed by the District Court, served as a factual finding on damages.

This Court has stated that "the proper sanction must be no more severe . . . than is necessary to prevent prejudice to the movant." *Wilson*, 561 F.2d at 503

-50-

(internal quotation marks omitted). The Magistrate Judge considered an instruction to the jury that "the information on those invoices would have assisted the plaintiffs in proving their damages claim." JA622-23. This instruction, while not based on any factual showing, would have at least been more tailored to the documents allegedly spoliated.

It is a factual certainty that the allegedly spoliated documents—Ministry invoices related to *non*-Blue Sky LLC vendors—would not have shown that ATG earned $20 million in profits on Blue Sky LLC ticket sales. That is because the Ministry invoices allegedly spoliated did not relate to any Blue Sky LLC tickets. JA313.

Yet, without any evidentiary hearing, the Magistrate Judge found that the appropriate sanction was that ATG should be presumed to have earned $20 million in profits on the Blue Sky LLC tickets. The Magistrate Judge's instruction was based solely upon the representations of Plaintiffs' counsel who asserted that Mr. Riad had stated that he expected to earn $5-$6 million in profits. JA623. Plaintiffs' counsel did not provide deposition testimony or an affidavit to the Magistrate Judge, but argued that because Mr. Riad was due 51% of Blue Sky LLC's profit, and Blue Sky LLC would get 50% of ATG's profit, ATG's profit would be around $20 million. JA623-24.

What a review of the evidence would have shown to the Court, however, was that Mr. Riad was claiming his "ultimate share of profits . . . to be between $5,000,000 and $6,000,000 *annually*." JA381 (emphasis added); JA670 (Plaintiffs' counsel later stated: "The record substantiates that Mr. Riad has testified in deposition that he was told his personal share of the profits would be expected to be $5,000,000.00 to $6,000,000.00 *a year*." (emphasis added)); *see also* JA829 (Riad: "Dr. Nasser he told me that my profit would be between 5 to 6 million."). Blue Sky LLC, however, only purchased tickets for the Ministry for six to eight weeks in 2012. *See* JA843. While Blue Sky LLC sold $18.4 million in tickets, this was far less than the $60 million in annual ticket sales that Mr. Riad anticipated. JA828-29 (stating he expected to get half of ATG's $120 million in annual US ticket sales). The Magistrate Judge's evidentiary presumption of $20 million in profit, affirmed by the District Court, was thus clearly erroneous in the absence of an evidentiary hearing or any factual findings supporting such a presumption.

Further, this presumption deprived ATG of its opportunity for a fair trial on damages, and was significantly more severe than was necessary to prevent prejudice to Plaintiffs from ATG's failure to retain original Ministry invoices for non-Blue Sky LLC vendors. The evidentiary presumption here was disproportionally severe and clearly erroneous in relation to the wrongdoing.

**D.    Defendants Are Entitled To A New Trial On The Basis Of The Spoliation Finding And Evidentiary Sanction**

The Magistrate Judge's evidentiary presumption of damages was an abuse of discretion and poisoned the entire trial.  Defendants deserve to have their day in court and to be allowed to present their case free of any erroneous evidentiary presumption and prejudicial attacks on their credibility.    Under these circumstances, Defendants are entitled to a new trial following the reversal of the District Court's spoliation finding and evidentiary sanction.  *See Ty v. Softbelly's Inc.*, 353 F.3d 528, 533-35 (7th Cir. 2003) ("The sanction was excessive, unreasonable, and so must be reversed. . . . These errors taken together require that there be a new trial . . . ."); *see also Murphy v. Magnolia Elec. Power Ass'n*, 639 F.2d 232, 234-35 (5th Cir. 1981) ("We hold that the trial judge committed reversible error in excluding expert testimony [as a sanction for appellants not having supplemented interrogatories] and remand for a new trial.").

## CONCLUSION

For all of the foregoing reasons, this Court should reverse the District Court's denial of Defendant's Motion for Judgment as a Matter of Law, order that Plaintiffs' alleged oral agreement is unenforceable pursuant to Virginia's Statute of Frauds, and vacate the judgments against ATG and Dr. Al-Tayyar and remand with instructions to dismiss the complaint.  In the alternative, this Court should reverse the decision of the District Court affirming the Magistrate Judge's erroneous

spoliation finding and unfair evidentiary sanction on damages, vacate the judgments against ATG and Dr. Al-Tayyar, and remand this case for a new trial of all claims. The costs of this appeal should be taxed against Plaintiffs.

## REQUEST FOR ORAL ARGUMENT

ATG and Dr. Al Tayyar respectfully submit that this appeal raises important issues warranting oral argument and full consideration by this Court. The District Court's decision that Virginia's Statute of Frauds does not apply—not because full performance could occur within a year but because performance could hypothetically be excused—is unfaithful to the controlling decisions of the Supreme Court of Virginia and threatens to undermine the important policies underlying the Statute of Frauds.

In addition, the District Court's finding of spoliation and its imposition of evidentiary sanctions are based on the unfounded and unworkable notion that litigants have an obligation to preserve all documents, whether relevant or not. Such an obligation could cripple the sound operation of many litigants. Furthermore, in this day and age of electronic data storage, litigants need authoritative guidance on their obligations to preserve information.

Oral argument will help ensure a full airing and consideration of these important issues, which impact not only the parties to this appeal but litigants throughout the Fourth Circuit.

Dated:   April 21, 2014
         Washington, D.C.

Respectfully submitted,

Christopher M. Curran
Nicole Erb
Matthew S. Leddicotte
**WHITE & CASE**LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone:      + 1 202 626 3600
Facsimile:       + 1 202 639 9355

*Attorneys for Defendants-Appellants*
*Al Tayyar Group and*
*Nasser Aqeel Al-Tayyar*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.  This brief contains 12,806 words (as calculated by the automatic word count function of Microsoft Word), excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point, Times New Roman font.

Dated:   April 21, 2014                    /s/ Matthew S. Leddicotte
         Washington, D.C.              Matthew S. Leddicotte
                                       **WHITE & CASE** LLP
                                       701 Thirteenth Street, N.W.
                                       Washington, D.C.  20005
                                       Telephone:      + 1 202 626 3600
                                       Facsimile:      + 1 202 639 9355

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 21, 2014, a true and correct copy of the foregoing Brief of Defendants-Appellants Al Tayyar Group and Dr. Nasser Al-Tayyar was electronically filed with the Clerk's Office of the U.S. Court of Appeals for the Fourth Circuit, and further certify that the parties' counsel will be notified of, and receive, this filing through the "Notice of Docket Activity" generated by this electronic filing.

Pursuant to Local Rule 31(d), eight copies of the Brief of Defendants-Appellants Al Tayyar Group and Dr. Nasser Al-Tayyar were also transmitted to the Clerk's Office of the U.S. Court of Appeals for the Fourth Circuit by overnight delivery by Federal Express on this same date.

/s/ Matthew S. Leddicotte
Matthew S. Leddicotte
**WHITE & CASE**LLP
701 Thirteenth Street, N.W.
Washington, D.C.  20005
Telephone:      + 1 202 626 3600